Charles W. Hemingway, Self-Represented
hemingwaych@bendnet.com
680 NW Bond St., Bend, OR 97703-3274
(458) 206-8682
Eric Garrity, Self-Represented
Eric.garrity87@gmail.com
680 NW Bond St., Bend, OR 97703-3274
(412) 706-2160

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION 6

**Case No: 6:25-cv-00640-MC**

| | | |
|---|---|---|
| Theresa Bradshaw, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | PLAINTIFF'S REPLY TO |
| v. | ) | DEFENDANT'S RESPONSE TO |
| | ) | PLAINTIFF'S REQUEST FOR |
| Holly Jewkes, *et al.*, | ) | TEMPORARY RESTRAINING ORDER |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants | | |

Dated: __04/29/2025_____

s/_*Charles W. Hemingway*_____
Charles W. Hemingway, Self-Represented

# INTRODUCTION

Plaintiffs offer this Reply to Defendant's Response to our Request for a Temporary Restraining Order.

Plaintiffs renew their claim that they have carried the necessary burden to obtain the drastic remedy of a TRO against the May 1, 2025 public closure of the Cabin Butte project area and that they have met the necessary elements to support a TRO. Plaintiffs reassert their likelihood of prevailing on the merits of their claims, particularly regarding the failure of Defendant's to establish that they met the National Environmental Policy Act (NEPA) requirement in the Cabin Butte project area EA to take into account the adverse impact on the human environment, as well as all other claims in their Complaint.

Plaintiffs reassert their claim that they have shown a likelihood of irreparable harm.

Finally, Plaintiffs reassert that the balance of the equities and the public interest support Plaintiffs in being granted a TRO.

# LEGAL STANDARDS

## I.  Standard for a Temporary Restraining Order.

Acknowledging that *Winter v. Nat. Res. Def. Council, Inc.,*. 555 U.S. 7, 22 (2008) outlines the four requirements a Plaintiff must establish for seeking a preliminary injunction, and restating that Plaintiffs have met these requirements, Plaintiffs urge the Court to apply the alternative Ninth Circuit standard of *All. For the Wild Rockies v. Cottrell,* 632 F. 3d 1127, 1131-32 (9th Cir. 2011). Plaintiffs have established serious questions going to the merits, have shown that they and other similarly situated unhoused individuals in the Cabin Butte project area will

suffer irreparable harm if a TRO is not granted, have established that the balance of the equities tip sharply in their favor and that, given the undue burden that an en masse displacement of unhoused persons from China Hat will have on the local community and community services, have established that a TRO that delays the Cabin Butte project until a temporary, rolling closure that permits the unhoused living there the opportunity to relocate in a timely, efficient manner is in the public interest.

## II. Pro se Plaintiffs in this set of unique circumstances should be permitted to pursue claims on behalf themselves and others similarly situated.

Defendants note a general rule prohibiting pro se plaintiffs from pursuing claims on behalf of others in a representational capacity, citing as support *Simon v. Hartford Life, Inc.,* 546 F. 3d 661 (9th Cir. 2008). Plaintiffs contend that *Simon* is distinguishable from the facts at issue here. *Simon* dealt with a pro se plaintiff who was seeking to pursue claims in a representative capacity on behalf of an ERISA plan, which involved a statutory requirement that a party seeking to bring forth such claims must be represented by counsel and could not proceed with attempting to represent the ERISA plan in a pro se action.

Such is not the case at bar here. Further, while the *Simon* court notes that courts have routinely adhered to the general rule prohibiting pro se plaintiffs from pursuing claims on behalf of others in a representative capacity, the court acknowledged at footnote 6, at least one exception to the general rule. Plaintiffs ask this court under the unique circumstances here to depart from the general rule.

Plaintiffs are part of a unique community of similarly situated unhoused individuals whose circumstances are inextricably interrelated. The irreparable harm done to the four unhoused plaintiffs here is the same irreparable harm that will be done to the other unhoused individuals who are not individual plaintiffs in this action. It was exceedingly difficult for

service providers to track down and locate the 80 unhoused individuals who submitted disability discrimination complaints. It would have been a virtual physical impossibility to engage in the interactions necessary to make those 80 unhoused individuals plus the estimated additional 40 to 60 unhoused individuals living in the Cabin Butte area plaintiffs to this action and it would have been exceedingly burdensome on this court to deal with that many individual plaintiffs.

Plaintiffs are also disabled individuals and seek to represent themselves and 76 other unhoused individuals who have filed disability discrimination complaints against Defendants, which have gone unprocessed by Defendants. It is inequitable to think that this Court could order as relief that Defendants process the disability complaints of these four Plaintiffs who have raised disability claims but that the remaining 76 be left unresolved and unacted upon by Defendants.

The concept of equity begs that this Court acknowledge that the facts and circumstances here authorize an exception to the general rule.

## III. The homeless service provider plaintiffs have standing.

Defendants say that service provider Plaintiffs Hemingway and Garrity are not homeless, do not reside in the Cabin Butte project area and have no third-party standing because there are other homeless individuals who are already plaintiffs. Defendants cite *Wedges/Ledges of Ca., Inc. v. City of Phoenix, Ariz.,* 24 F. 3d 56 (9th Cir. 1994) for the proposition that third-party standing is to be rejected where directly injured parties are joined in the suit.

Plaintiffs Hemingway and Garrity believe, in fact, that *Wedges/Ledges* supports their status as having standing. *Wedges/Ledges* involved a situation where the manufacturer of a game sought a legal remedy where the City of Phoenix had imposed restrictions on owners and operators of the game.

The *Wedges/Ledges* court noted that standing involves prudential dimensions that include a requirement that the plaintiff "must assert his own rights, rather than rely on the rights and interests of a third party" and allege an interest within a protected zone of interests.

The *Wedges/Ledges* court noted that while a plaintiff cannot rest a claim to relief on the legal rights or interests of third parties, the Supreme Court, in *Warth v. Seldin,*, 442 U.S. 490, 95 S. Ct. 2197, 45 L.Ed. 2d 343, recognized an exception where the plaintiff meets the following three criteria: First, the plaintiff must have a concrete interest in the outcome of the dispute; second, the plaintiff must have a close relationship with the party whose rights it is asserting, and third, "there must exist some hindrance to the third party's ability to protect his or her own interests," *citing Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), *see also Wauchope v. United States Dep't of State*, 985 F. 2d 1407 (9th Cir. 1993).

Plaintiffs Hemingway and Garrity assert that they meet the Wedges/Ledges prudential dimensions because they are asserting their own rights rather than relying on the rights and interests of the unhoused plaintiffs. While the rights of Plaintiffs Hemingway and Garrity flow from the circumstances involving those unhoused, including the four unhoused plaintiffs, in the Cabin Butte project area, the rights they assert are separate and distinct. It is the role of Plaintiffs Hemingway and Garrity to take services to those unhoused in the Cabin Butte project area and when their ability to bring those services to such clients is disrupted, it directly impacts their rights to do their job.

Plaintiffs Hemingway and Garrity have lived through prior sweeps of homeless encampments in which they lost track of where their clients were due to the displacements. It cost them time and effort in trying to track down where these displaced individuals had gone, impacting their right to do their job in bringing services to their clients. Plaintiffs Hemingway

and Garrity believe, based on their positions as service providers, that they have a protected zone of interest based on their positions' responsibilities, that gives them a direct interest in asserting their own rights. Additionally, Plaintiffs Hemingway and Garrity have spent at least a thousand hours conducting homeless outreach as volunteers, and both expect to continue engaging in homeless outreach in the future with these vulnerable populations. (*See Lindberg v. U.S. Forest Serv.,* 132 F. Supp. 3d 1255 (D. Or. 2015).

Notwithstanding, should it be found that Plaintiffs Hemingway and Garrity do not meet the *Wedges/Ledges* prudential dimensions, Plaintiffs Hemingway and Garrity believe that they meet the *Warth v. Seldin* exception. Plaintiffs Hemingway and Garrity have a concrete interest in the outcome of the dispute, have a close relationship with the four unhoused plaintiffs and all the other similarly situated unhoused individuals residing in the Cabin Butte project area, and that there is some hindrance to the four unhoused plaintiffs (and all those others similarly situated in the Cabin Butte project area) to protect their own interests.

The four unhoused plaintiffs all meet the Department of Housing and Urban Development (HUD) definition of chronically homeless (having been homeless for years) and lack a level of sophistication in dealing with complex matters such as protecting their interests in legal proceedings that a member of housed society might not have to confront.

## FACTUAL BACKGROUND

### I.  The Cabin Butte project

Plaintiffs generally admit Defendant's statements factual statements describing the Cabin Butte project with these additional comments and with certain noted exceptions.

Defendants include as Exhibits F & G to the Jewkes Declaration (p. 4, Defendant's Response) photographs of camp areas. Plaintiffs believe the selected photographs do not provide

a true picture of what many of the encampments look like and are meant to paint all homeless persons in a bad light.

Exhibit F is a photograph of a camp area. Plaintiffs ask the court to take note of the condition of the roads in the foreground – muddy and virtually impassable. The road conditions shown substantiate Plaintiff's claims that the amount of time given by Defendants (approximately 3 ½ months) to relocate was woefully inadequate given the winter conditions when snow and ice made roads impassable for weeks on end and when the snow and ice melted, the roads remained virtually impassable due to the muddy, wet conditions. Plaintiffs will testify that when the amount of time due to winter conditions and muddy, impassable roads is extracted from the 3 ½ months, those living unhoused in the Cabin Butte area had what amounted to only about one month.

Exhibit G is a photograph that presents an inaccurate picture that this Court should give little or no weight. Exhibit G is clearly a photograph of an abandoned camp (note the missing door of the vehicle). Defendants would have the viewer left with the impression that the accumulated trash around the abandoned trailer is solely from its former occupant(s.) and that all camps look like this. Many of the unhoused community living in the China Hat region of the Cabin Butte project area have lived there for years and have landscaped their areas with rock walkways, planted bushes and flowers, etc. Plaintiffs report that often members of the housed community come onto encampment areas and dump their household trash, furniture, large appliances, etc. and those living in the area get the blame.

Plaintiffs deny Defendant's assertion (pp. 4-5, Defendant's Response) that the steady increase of human-caused fire starts in the area correlates with an increase in the population in the encampments. That statement is inaccurate, Plaintiffs contend. Plaintiffs would

acknowledge that the increase in human-caused fire starts in the area correlates with an increase in human activity, but does not correlate necessarily with an increase in the number of encampments.

The wholesale large growth of Bend and the surrounding Deschutes County has led to a corresponding increase in the number of people using Deschutes National Forest lands, particularly the Cabin Butte project area because of its close proximity to Bend. While there have undoubtedly been fire starts in homeless encampments, the Cabin Butte area is a popular area for off-trail vehicle riders, horseback riders and others who use those public lands. Over summers these people will camp within the forest to engage in those activities while they are on vacation. Similarly, the Cabin Butte area is a popular area for target shooting in areas like Horse Butte, the Coyote Butte OHV area, Bessie Butte and Cabin Butte and some fire starts should be attributed to target shooting activities. (Defendant's Response, p. 6 notes that rock pits are used for recreational shooting, but target shooting activities are not limited to only rock pits).

Accordingly, Plaintiffs deny Defendant's assertion at Page 5, Defendant's Response that increased human fire starts in the project area directly correlate with the increase of the long-term homeless population.

Plaintiffs assert that the statement by Defendants (Page 5, Defendant's Response) concerning outreach strategies directly supports Plaintiff's sought-after TRO. Defendants state that "(T)he EA noted outreach strategies that the Forest Service would employ during implementation to these (unhoused) individuals while addressing resource damage and public health/safety concerns." Plaintiff's Exhibit 4 shows the paragraph where Defendants made this statement, in November 2022. Twenty-six months later, with no action by Defendants to put in place a plan during implementation, Defendant's Exhibit C is issued by the Forest Service.

Defendant's Exhibit C, the January 16, 2025 Press Release announces a hard closure on May 1, 2025, with no reference to steps that might be taken during implementation. Instead, Defendant's Exhibit C announces that anyone found on the land or who enters the Cabin Butte project area after May 1, 2025 is subject to arrest and potentially a $5,000 fine and up to a year in jail. Accordingly, Defendant's statement at Page 5 quoted above, is directly rebutted by Defendant's statements and inaction.

Plaintiffs take issue with the statement at Page 5, Defendant's Response, that Plaintiffs did not file any objections to the Draft EA of November 2022 as disingenuous. Defendants well know that at this point Plaintiffs could not object even if they wanted to because only those who made comments to the Draft EA in May 2022 were entitled to object.

Plaintiffs note that at Page 6, Defendant's Response, Defendants state that collaboration began in January 2023 with the City of Bend, Deschutes County and unnamed "other partners". Plaintiff Hemingway, a longtime member of the Central Oregon Homeless Leadership Coalition and its Street Outreach Committee, comprised of service providers who engage in homeless outreach in the China Hat region of the Cabin Butte project area where the majority of the homeless encampments are located, will testify under oath that no service providers listed in Defendant's Exhibit J were apparently included as "other partners", with the possible exception of NeighborImpact, which does not engage in homeless outreach in China Hat or elsewhere.

Plaintiffs dispute the statement at Page 6, Defendant's Response, that the January 2025 notifications were either early or provided, as Defendants claim, ample time to find more suitable living arrangements. Plaintiffs have noted in this Reply the inability of the unhoused living in the Cabin Butte area to be able to relocate due to the harsh winter weather conditions over much of the 3 ½ months the Forest Service has allowed. The decision by the Forest Service to issue a

closure notice during the winter period runs counter to what the Forest Service recognized in its Final EA (Plaintiff's Exhibit 4, to wit: "this proposal has the potential to disproportionately affect people experiencing homelessness who camp on National Forest System lands because they have fewer resources available to allow them to choose another location."  Again, Defendant's own Exhibit F dramatically illustrates the conditions within the encampment areas that existed during these winter conditions.  When these unhoused individuals are living miles south of the City of Bend, on foot with no transportation of their own and no public transportation available Defendant's assertion that it provided "ample time" is specious.

## II.  This Litigation

Plaintiffs accept that, as noted in Defendant's Response Page 7, this Court provided the U.S. Attorney's Office with a copy of the pleading and ordering a response, and that while a technical error occurred with Plaintiff's not serving the U.S. Attorney's Office, putative service has been accomplished and this matter is resolved.

Defendant's comment that "(N)o community or service organizations have joined Plaintiff's request for a TRO" is puzzling and, Plaintiffs contend, irrelevant, but worth addressing anyway.

Community and service organizations have consulted and coordinated with plaintiffs continually since the January 16, 2025 announcement of a May 1, 2025 closure date. Community and service organizations that engage in homeless outreach exist on shoestring budgets with tight margins, with too few employees and too many unsheltered homeless clients to serve.  Community service organizations, while expressing support for our TRO efforts, are not financially able to undertake this effort due to the inability to hire a lawyer and were reluctant, given staffing and time constraints, to join this TRO effort.  There is also an underlying

reason, related to the current national political environment, that dissuaded service organizations from joining this TRO effort. Community service organizations that rely heavily on federal dollars to support their operations expressed fear that if they joined an effort that ran counter to the national political agenda, or offending political appointees that lead federal agencies, it could result in the loss of federal dollars they need in order to stay in operation.

**ARGUMENT**

**I. Plaintiffs have established a likelihood of success and have raised serious questions on the merits.**

Defendants assert that Plaintiff's complaint/request for a TRO does not identify any waiver of the government's sovereign immunity. While not expressly cited in Plaintiff's Complaint, Plaintiffs cite to the express language of 5 U.S. Code Sec. 702, Administrative Procedure Act, which states that a person suffering a legal wrong because of an agency action or adversely affected or aggrieved by agency action is entitled to judicial review thereof.

Additionally, 5 U.S. Code Sec. 704, Administrative Procedure Act, states that agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

Plaintiffs contend that Sec. 702, Administrative Procedure Act, is a statute that makes this final agency action (Defendant's Exhibit B, Finding of No Significant Impact) reviewable and that there is no other adequate remedy in a court, thus Defendant's actions are subject to judicial review by this Court. Plaintiffs state that this action seeking a TRO falls within an unequivocally expressed waiver of sovereign immunity by Congress. *Dunn & Black P.S. v. United States*, 492 U.S. F. 3d 1084 (9th Cir. 2007).

**A. Plaintiff's NEPA claims have a strong likelihood of success.**

Plaintiffs acknowledge that internally NEPA does not contain provisions for judicial review and it is thus apparent that Plaintiff's NEPA claims be reviewed under the Administrative Procedure Act.

### 1. Plaintiffs deny that there are fundamental threshold problems with their NEPA claims.

First, Plaintiffs have addressed the issue that they never submitted any objections under the Forest Service's NEPA process. As noted, they were prevented from doing so by the Forest Service requirement that in order to submit objections, they first must have submitted comments to the Draft EA. Plaintiffs deny they received adequate notice of the opportunity to submit comments.

While there may have been a 30-day comment period in May 2022, no notice was given to the affected population – the homeless living on the land. It appears that a limited number of scientists, residents of adjacent neighborhoods and government entities were provided copies of the Draft EA for comment. While there also may have been notice published in agate print in a local newspaper's classified section, this equitably does not constitute actual notice to the affected population of the homeless living on the land in that they lack access to such media.

In essence, when the provisions cited by Defendant's (Defendant's Response, Page 9) at 36 C.F.R. Sec. 218.14(a) that individuals and groups must structure their participation so as to alert the local agency officials making particular land management decisions of their positions and contentions actually play out, the restrictive wording that limits objections to only those who have submitted comments denies Plaintiffs a substantive ability to take part in notifying the agency (Forest Service) of their positions and contentions because no adequate notice was ever received.

Plaintiffs aver that they have met the exhaustion of administrative remedies review process requirements of 36 C.F.R. Sec. 218.14(b). Plaintiffs were precluded from filing objections by the restrictive nature of Defendant's 36 C.F.R. provisions, as cited above.

Plaintiffs contend that *Lindberg v. U.S. Forest Serv*., 132 F. Supp.3d 1255 (D. Or. 2015) does not constitute a bar to Plaintiff's proceeding with this action. First, as noted above, Plaintiffs could not waive their NEPA claim in federal court because Plaintiffs were precluded from raising the issue during the administrative process due to Defendant's restrictive review procedures that prevent objections from being raised if one has not made comments previously. Second, Plaintiffs contend that based on Defendant's own regulations, the administrative process is arguably not over, as discussed below.

In *Lindberg*, Plaintiff Kreg Lindberg raised timely objections to many aspects of the Welcome Trails Connections Project and the District Court fully analyzed many of his objections that led to his lawsuit under NEPA and the Administrative Procedure Act. But Lindberg attempted to raise an objection to a project called the Haul Road Trail and the court found, as Defendants noted, that he had not timely raised his objection under 36 CFR 218.14(a) and the court granted the Forest Service summary judgment on that aspect.

*Lindberg*, however, did not raise the issue that Plaintiffs have raised in this case, which is the applicability of Section 18 of Forest Service Handbook (FSH) 1909.15 (Plaintiff's Exhibit 8).

Section 18 advises Forest Supervisors to be alert for new information or changed circumstances that might affect decisions of actions awaiting implementation (as is the case here) and in such cases to determine if an environmental analysis or documentation needs to be corrected, supplemented or revised.

In the Final EA Defendants acknowledged that the number of homeless encampments had risen from 10 in a 2010 survey to 19 in a 2020 survey, yet the Forest Service never conducted another survey after 2020, despite Defendant Jewkes' acknowledgment in a letter sent on April 7th, 2022 to Bend city officials and Deschutes County officials that more than 200 homeless people were living in the China Hat area (Defendant's Exhibit H).  And as Plaintiffs have noted (Plaintiff's Exhibit 3, p. 22), Defendant Jewkes wrote again to Bend city officials and Deschutes County officials in July 2023 warning about the city's pending sweep  of a large encampment on Hunnell Road and the adverse impact it would have on the increase of unhoused campers in the China Hat area.

As Plaintiff's noted in their Request to Reopen (Plaintiff's Exhibit 9), it was the exponential increase in the number of unauthorized encampments _after_ the 2020 survey, particularly the exponential increase in the number of unauthorized encampments _after_ the issuance of the Final EA in November 2022, an exponential increase that swelled the number of unauthorized encampments to upwards of 90 encampments in 2023-2024 within the project area. This constituted new information and changed circumstances within the meaning of Section 18 that should have alerted the Forest Service that it was necessary to correct, supplement and/or revise the environmental documents and reconsider the final decision to take action.

Plaintiffs assert that Section 18 of FSH 1909.15 does away with any attempt by the Forest Service to claim that the failure to respond within the 30-day notice and comment period or failure to file an objection under 36 C.F.R. Sec. 218.14(a) prevents a legal challenge of a project.

Plaintiffs assert that Section 18 specifically addresses situations where a 30-day notice and comment period or the objection period to an EA is long past and final environmental documents and decisions to take action have been issued.  Section 18, in Plaintiff's view,

permits a legal challenge in situations where it can be established that the Forest Service failed to consider new information or changed circumstances and as a result, Plaintiffs will suffer adverse consequences and irreparable harm from the agency's actions.

Defendants cite *Morris v. Myers*, 845 F. Supp. 750 (D. Or. 1993) for the proposition that homelessness does not fall within the zone of interests that NEPA is intended to protect. Plaintiffs believe that vis-à-vis the circumstances of this case and the facts involved in *Morris*, that statement is taken out of context and the *Morris* court has further statements that support Plaintiff's contentions that Defendant's EA is legally insufficient for failing to take into account the impact on the human environment.

In *Morris* the issue was an effort to halt the construction of a new federal courthouse in downtown Portland that was objected to by plaintiffs in that case because it would result in the project's possible impact on Portland having less low-income housing stock. The *Morris* court found that the plaintiff's claims were so overbroad in construing NEPA that in the characterization of the court, it amounted to plaintiff's wanting to use NEPA to solve the "social and economic shortcomings in society" instead of dealing with the narrower environmental consequences. That was the context within which the *Morris* court's comment fell about homelessness not falling within the zone of interest NEPA is intended to protect.

Here, Plaintiff's claims are much narrower and involve the individual irreparable harm they will suffer if the Cabin Butte project results in their en masse displacement on May 1, 2025.

Instead, Plaintiffs ask this Court to consider other language used by the *Morris* court that aligns with Plaintiff's claims in this case. The *Morris* court stated: "NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in

the decision making process" and that "NEPA encompasses social and economic impacts that are interrelated with or caused by natural and physical impacts flowing from a major federal action.", citing *Port of Astoria, Oregon v. Hodel*, 595 F. 2d 467 (9th Cir. 1979).  The *Morris* court further noted that Council on Environmental Quality regulations require that agencies take into consideration the "human environment", to include "the natural and physical environment and the relationship of people with the environment."

Plaintiffs acknowledge that the *Morris* court stated that NEPA is not the proper means for achieving the overarching goal of ending homelessness or solving other social and economic shortcomings.  But Plaintiffs here are not seeking to solve world homelessness.  Instead, the *Morris* decision does not preclude Plaintiffs in the case at bar from seeking their limited remedy of avoiding irreparable harm by being displaced from the homes they have known for years when it is within the ability of this Court in a TRO to grant Plaintiffs the ability not to lose their homes and all their possessions in one fell swoop.

### 2. Plaintiffs dispute that there are substantive problems with the merits of Plaintiff's NEPA claims.

#### a. The Forest Service did violate its regulations.

Plaintiffs have addressed the Forest Service's misapplication or failure to adhere to Sec. 18 of the Forest Service Handbook previously cited and we need not further re-address that issue here.

The Forest Service has violated its own regulations about what should have been taken into account in the planning, dating back to November 2022:  Per Plaintiff's Exhibit 13, the Forest Service was supposed to take into account social impacts on local governments such as "***Overburdened public services, police, fire, libraries, hospitals, jails, juvenile homes, social***

*services, parks, playgrounds, swimming pools, increased traffic…abandoned cars, etc."[1]*

(Forest Service Handbook 1909.17 – Economic and Social Analysis Handbook, Chapter 30 – Social Analysis, Page 39)

Additionally, the Forest Service was also required to take into account the impact its actions might have on "affected persons", recognizing that its actions might produce: "***Greater incidence of anxiety, mental illness, alcoholism and other drug abuse, suicide."[2]*** Forest Service Handbook 1909.17 – Economic and Social Analysis Handbook, Chapter 30 – Social Analysis, Page 38)

### b. The Forest Service did not abide by the applicable notice requirements.

Plaintiffs submit that in this Reply they have previously addressed how the Forest Service disadvantaged Plaintiffs by not abiding by notice requirements that would have afforded Plaintiffs notice and an opportunity to be heard. Instead, the Forest Service sent letters to certain scientists and other government and community groups and did not contact or notify the population that would be most adversely affected by the environmental actions the Forest Service was proposing to take – the Cabin Butte project.

---

[1] The economic impact the displacement en masse of more than 100 homeless is likely to have on already overburdened public services is illustrated by a KTVZ Channel 21 news item at Page 41 of Plaintiff's Exhibit 3, News Articles. The item notes that ODOT spent $440,000 in 2024 clearing camps from ODOT properties along the highways in Bend. Displacement of that many people from China Hat will increase the number of displaced homeless seeking shelter on ODOT land, placing this financial burden on ODOT, on the city of Bend for the increased costs it will incur and on Deschutes County for increased costs the county will incur.

[2] This is from a study published in the Journal of the American Medical Association: "At least 500 000 people in the US experience homelessness nightly. More than 30% of people experiencing homelessness also have a substance use disorder. Involuntary displacement is a common practice in responding to unsheltered people experiencing homelessness. Understanding the health implications of displacement (e.g., "sweeps," "clearings," "cleanups") is important, especially as they relate to key substance use disorder outcomes. Involuntary displacement is estimated to worsen overdose and hospitalizations, decrease initiations of medications for opioid use disorder , and contributed to deaths among people experiencing homelessness who inject drugs" *Population-Level Health Effects of Involuntary Displacement of People Experiencing Unsheltered Homelessness Who Inject Drugs in US Cities,* (JAMA 2023 Apr 10,;329(17):1478–1486.)

**B. Plaintiff's allegations regarding disability discrimination complaints have likelihood of success.**

The Final EA (Plaintiff's Exhibit 1, Defendant's Exhibit A) establish the ability of these four individual homeless Plaintiffs and the other 76 who filed Disability Complaints to bring their claims. Inside the Cover of both the Final EA and the FONSI is this statement: "In accordance with Federal civil rights laws and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, employees and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA…"

Those who wish to file a program discrimination complaint are advised how to do so and provided an agency form, which these Plaintiffs and the 76 other individuals used to file their disability discrimination complaints.

Plaintiffs provided this Court at Plaintiff's Exhibit 6 a Synopsis of the basis for the 80 individual disability discrimination complaints. Plaintiffs noted in their Complaint that they were providing this Synopsis in lieu of submitted the 80 individual complaint forms, noting that they would be provided to this Court upon request but that for reasons of privacy and because these 80 individuals were concerned about retribution or retaliation against them by local Forest Service officials if their names were listed in Exhibits to this Complaint, a Synopsis was to be used.

**II. Plaintiffs have demonstrated a likelihood of irreparable harm.**

Plaintiffs stand by the recitation of irreparable harm they will individually suffer that are contained in their Complaint.

Defendants assert that Plaintiffs should have responded as soon as the Forest Service issued its January 16, 2025 notice and that because of the delay in initiating this Complaint, Plaintiffs should not be heard.

Plaintiffs respond that Plaintiffs acted as quickly as possible given the harsh winter weather and the need to go through the process of exhausting administrative remedies. Plaintiffs assert that under the circumstances their responses were timely and appropriate and that Defendant's allegation that they created their own delay and emergency are specious.

**III. The balance of the equities and the public interest favor issuance of a TRO.**

Plaintiffs have laid out in this Complaint the inequity of forcing them to lose their homes and their property when the Forest Service announced in November 2022 that it would set up a mitigation program to be begun upon implementation, but failed to do so. Instead, the Forest Service abrogated its responsibility to set up a mitigation program upon implementation that would allow these Plaintiffs and the other similarly situated homeless to be moved out in an orderly process by announcing a hard closure in its January 16, 2025 notice.

Defendant's own Declaration by Defendant Jewkes (Defendant's Exhibit 13) indicates that it would be equitable to grant Plaintiff's TRO. At Paragraph 12 Defendant Jewkes states that while the Forest Service will close the gates on May 1, 2025, in late July it will shut down timber and vegetation management operations under heightened IFPL restrictions due to seasonal fire conditions.

Plaintiffs contend that the equities here lie with themselves. If the Forest Service is going to shut down operations due to seasonal fire conditions for likely several months, that is a time frame by which those unhoused persons could be relocated from the project area on a scheduled, timely basis so that when operations resume after fire season is over, all the homeless will have been relocated.

Defendant Jewkes' Declaration at Para. 16 further states that due to the likelihood of fire and high recreation use season, Deschutes National Forest staff are likely to be pulled away to emergencies in other areas of the national forest. If such is the case, the equities would lie in favor of Plaintiffs in the sense that if Deschutes National Forest staff are likely to be pulled away anyway, during this time there would be no recreational activities occurring (such as horseback riding, ATV riding, etc. and all that would remain is for service providers to be relocating the homeless from the area, which would not put a burden on Forest Service staff.

Defendant Jewkes' Declaration at Para. 17 states that the Forest Service engaged with local service agencies and community partners, followed by a list which is telling in its absence of identifying real local service agencies that work with the homeless. On the Forest Service's list at Para. 17 it states the City of Bend, Deschutes County, the Coordinated Houseless Response Office, the Sheriff's office and "various local service providers" <u>without naming a one</u>. Plaintiffs assert that their testimony will demonstrate that no service providers ever advised these four individual Plaintiffs, nor the two service provider Plaintiffs that they were working with the Forest Service on any mitigation efforts.

Defendant Jewkes' Declaration is also telling at Para. 18, in which she states that she understands "that these local service providers have been actively working within (sic) the

individuals in the encampments to provide information, support and essential services, as discussed on page 223 of the project's November 2022 EA.

Defendant Jewkes' Para. 18 comments are telling in several regards. First, it proves Plaintiff's point that the Forest Service has not been working directly with service providers but apparently observing from afar. Second, it proves that the Forest Service never did implement plans after November 2022 to work with service providers, churches, community groups, etc. on a mitigation plan.

At Para. 19 Defendant Jewkes says she has relied heavily on service provider experience, but does not name a one, and instead lists agencies that have no direct daily interaction with the community of unhoused persons most directly affected in the project area.

Defendant Jewkes' Para 20 is also heartless and attempts to downplay the severity and the public health crisis impact that is involved. Defendant Jewkes states that site visits by her in the last several weeks and other Forest Service personnel indicate that up to 50% of the encampments have vacated. The public health emergency remains in that the 50% of encampments remaining likely house upwards of 80 to 90 individuals, most with disabilities. As noted above, the able-bodied have relocated, leaving the helpless, disabled community left behind.

Finally, Defendant Jewkes attempts to state in Paragraphs 21-24 why a rolling closure would not work, but these explanations should be accorded little weight. Plaintiffs are aware of no service providers who gave feedback that moving homeless individuals around within the project area would be stressful and confusing. But this shows that Defendant Jewkes misunderstands the concept of a rolling closure. Plaintiffs settlement offer of a rolling closure

has the individuals living on the land remaining in place. The "rolling closure" refers to the time sequence, not to moving people around within the project area. As individuals are moved out, no new individuals are allowed into the area and as time rolls on, the number left diminishes.

In Para. 22, Defendant Jewkes talks about the two project contracts involving 10,000 acres. Plaintiffs note that where the great majority of those living in the Cabin Butte project area are is about 900 acres. Plaintiffs submit that the Forest Service can program within this 10,000 acres where contractors can start work because it is not the case that all 10,000 acres will be engaged simultaneously.

In Para. 23 Defendant Jewkes talks about gates and barriers, but the evidence shows that all the gates and barriers are already in place, having apparently been fabricated for the locations where they are placed.

Regarding Para. 24, Plaintiffs submit that because of the confined area within which the remaining homeless are located, and the numbers that will dwindle with a rolling closure as described and offered in settlement by Plaintiffs, there will be little burden on law enforcement staff.

**CONCLUSION**

For the reasons stated above, Plaintiffs have established that they will suffer irreparable harm

and that the equities lie in favor of Plaintiffs, justifying this Court in issuing the requested TRO.

DATED this 29th Day of April 2025.

Respectfully submitted,

CHARLES W. HEMINGWAY, Self-Represented
and on behalf of the other named Plaintiffs and all
other homeless individuals in the Cabin Butte
project management area.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was submitted to the Federal District Court of

Oregon Case Management/Electronic Case Filing System and a copy of the foregoing was

placed within a first-class postage prepaid envelope and deposited in the United States Mail in

the City of Bend, Oregon on April 29, 2025, addressed to:


William M. Narus
Acting United States Attorney
1000 SW Third Street
Suite 600
Portland, OR 97204

Sean E. Martin
Assistant U.S. Attorney
1000 SW Third Street
Suite 600
Portland, OR 97204


/s/ Eric Garrity
ERIC GARRITY
Plaintiff, Self-Represented